Filed 6/9/23  P. v. Alvarez CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ISHMAL ANTHONY ALVAREZ,<br><br>    Defendant and Appellant. | B315396<br><br>(Los Angeles County<br> Super. Ct. No.KA122133) |

---

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Robert H. Derham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

---

A jury convicted defendant and appellant Ishmal Anthony Alvarez of forcible rape, forcible oral copulation, lewd acts on a minor, sexual battery,

and disorderly conduct by secretly recording the body of a minor. In a bifurcated proceeding, the court found true that appellant suffered a prior serious felony and a strike within the meaning of the Three Strikes law, and subsequently sentenced appellant to an aggregate prison term of 62 years.

On appeal, appellant raises seven issues, contending that: (1) the trial court abused its discretion in denying his *Marsden*[1] motion; (2) there was insufficient evidence to support a finding that the victim, R.H., was under 14 years of age during the commission of count 4; (3) the trial court violated his constitutional rights by refusing to discharge a sleeping juror; (4) the mandate of full-term, consecutive sentences required by Penal Code[2] section 667.6, subdivision (d), based on a court's finding that the offenses occurred on separate occasions, violates the Sixth Amendment right to a jury trial under *Apprendi v. New Jersey* (2000) 530 U.S. 466, and its progeny;[3] (5) the trial court erred in finding that consecutive sentences on counts 1 to 3 were mandatory under subdivision (d) of section 667.6; (6) the matter must be remanded for resentencing on counts 1 to 3 following the recent amendment to section 1170 by Senate Bill No. 567 (SB 567); and (7) the trial court violated appellant's due process rights by imposing fines and fees without first finding he had the ability to pay them.

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118.

[2] All further statutory references are to the Penal Code unless otherwise specified.

[3] Although this matter was initially deemed submitted on January 12, 2023, we subsequently vacated submission to allow the parties to brief this issue in light of a recent court of appeal decision in *People v. Johnson* (2023) 88 Cal.App.5th 487 (*Johnson*), review granted May 17, 2023, S279198, finding such constitutional error. As noted in our discussion, our Supreme Court has now disapproved of the *Johnson* decision on this point.

We conclude that appellant has forfeited his juror-discharge and fines/fees challenges by failing to interpose any objections with regard to these claims in the trial court. Discerning no reversible error in appellant's remaining contentions, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution Case*

1. *Background*

R.H. was born on July 3, 2000; she was 20 years old when she testified at trial. When R.H. was in the fifth grade, she met appellant's daughter, Kayla Alvarez, who was one grade behind her. The two became fast friends, "like sisters."

R.H. began spending most of her days and eventually most of her nights at the Alvarez house, where Kayla lived with her older brother, Myles, and appellant, her father.[4] R.H. became a member of the Alvarez household. She ate meals there, and appellant paid for her telephone, drove her to and from school, and took her shopping. Appellant was like a father to R.H., and she trusted him.

When R.H. was in middle school, appellant began buying her clothes and having her try them on. He took photos of her in the clothes. Some of the dresses were short and revealing, and R.H. felt uncomfortable wearing them.

_____

[4]     R.H. was placed in foster care shortly after she was born and lived with her foster parents and siblings, within walking distance of the Alvarez house. Her foster family never felt like a good fit for her. Her foster father left the home when R.H. was 10 years old, R.H.'s relationship with her foster mother was poor, and her two foster brothers were so much older that they never spent much time with her.

3

2. *The Sexual Offenses Charged in Counts 1-7*

In addition to photographing R.H. in clothing he purchased for her, appellant also took nude videos of R.H. without her knowledge and permission.

Appellant sometimes invited R.H. into his room at night. She would sit on the bed while he spoke to her, or he would have her try on clothes. He encouraged her to sleep on the bed.

On one occasion, when R.H. was in middle school, she fell asleep on the bed. She awoke when appellant slipped his hand down her pants and under her briefs. He rubbed her vagina and put his finger into her vagina. She told him to stop. He did not. She moved away, but he pulled her back so he could reach her vagina. Eventually she got up and went to Kayla's room. She did not tell Kayla, or anyone else, what had happened because she was embarrassed and could not understand the situation.[5]

Around the beginning of her freshman year in high school, appellant put handcuffs and Velcro restraints on R.H. while she and Kayla were in the living room. He said he did it to train R.H. how to escape if she ever found herself in that situation. He also put her in restraints many times when Kayla was not present. He tied her to the bed frame with Velcro so she could not free herself. On one of these occasions he rubbed her vagina and inserted a finger into her while she was bound. R.H. told appellant to stop

---

[5] The prosecutor argued this act was the basis for count 4, lewd act with a minor.

4

about a dozen times, but he continued touching her.  R.H. finally freed herself and left the room.[6]

Additional incidents took place one morning before school when R.H. was approximately 15 years old and a sophomore in high school.  Appellant asked R.H. to sit next to him on the living room couch.  He touched R.H. inappropriately on her vagina.  R.H. told him to stop.  Appellant kept persisting.  Appellant rubbed and put his fingers inside R.H.'s vagina.  R.H. told appellant that she had to get ready for school.  Appellant told her she still had time.

R.H. pushed appellant away, but appellant pulled her closer.  He took off her pants.  R.H. told him to stop.  Appellant held her down to prevent her from getting up.  He then performed oral copulation on her vagina.  R.H. again told him to stop, and that this was not okay.  He lowered his pants and had vaginal intercourse with her.  R.H. told him many times to stop, but he continued until he heard Kayla and her brother getting out of bed.  R.H. then left the room and took a shower.  Appellant took R.H., Kayla, and Myles to school.  R.H. threw up in the bathroom and went to the school nurse.[7]

That was the last time appellant touched her sexually.  R.H. continued to go to the Alvarez house.  She feared that if she were not there, appellant would do these things to Kayla.  After Kayla moved out of the house, R.H. stopped going there "as often."  She felt uncomfortable around appellant when she was alone with him.

---

[6]  The prosecutor identified this act was the basis for count 6, sexual battery.

[7]  The prosecutor argued the acts on the sofa occurred when R.H. was 14 or 15 years old, and were the bases for counts 1 through 3.

### 3. *Disclosure of Sexual Abuse*

Brissa Renteria had known Kayla since the sixth grade. Brissa also knew R.H. On July 23, 2016, R.H. told Brissa over SnapChat that appellant had violated her. Brissa asked R.H. what appellant had done to her. R.H. responded, "the most you could do but it never went in." R.H. testified that she was too scared to tell Brissa about appellant penetrating her. R.H. told Brissa that she was the first to know.

Brissa wondered how appellant could do these things if R.H. was always with Kayla. R.H. answered, "the mornings or when she was asleep or sometimes i would wait for her and he would try." She wrote that "it happened before school once freshmen year and I literally was so sick I couldnt eat or do anything i don't know what to do im going to tell her i need too."[8]

R.H. told Brissa she was "scared," and did not "want a court thing to happen." Brissa offered that R.H. could choose to do nothing if there was no proof. R.H. agreed, stating, "exactly and i don't want that and it is too late for proof but i don't want it to get to the law if that happens im scared i will get put into another home."[9]

After her message exchange with Brissa, R.H. told Kayla she had been raped. She said appellant had forced her to do sexual things but did not

---

[8]    The quoted portions of the messages are set forth verbatim, with the punctuation, capitalization, and grammar as in the original.

[9]    R.H. testified she thought she could be removed from her foster home if the authorities believed her foster mother was not keeping her safe. Although she did not get along well with her foster mother, she feared that if she were put in a different home she could be "abused," "starved," or moved "half way across the country."

describe the acts specifically. Kayla confirmed R.H. told her of the assaults in 2016-2017. R.H. did not want to call the police or publicize the incidents; Kayla agreed to keep silent.

R.H. also spoke of the sexual abuse to Cameron, a boy she dated from age 17 to age 19. In January 2019, Cameron told R.H.'s foster brother that R.H. had been sexually assaulted. The foster brother called the police.

4.     *The Investigation and Recovery of Evidence*

City of Glendora Police Officer Jacob Swan was the assigned investigator in this case and had special training in investigating sex-related crimes. Officer Swan interviewed R.H. three times.

The police searched appellant's home and found numerous electronic recording devices, phones, cameras, and thumb drives. The police also recovered a digital video recorder for a surveillance system.

Glendora Police Sergeant Matthew Fenner recovered images of R.H. from appellant's laptop and iPhone. There were approximately 2,226 images and 21 videos of her on the laptop. These included 83 still shots of R.H. in the bathroom, using the toilet or showering, and six videos of R.H. in the shower and using the restroom. All of these images appeared to have been captured without R.H.'s knowledge by a camera hidden in the bathroom. R.H. believed they were taken when she was 14 or 15 years old. The police also recovered a box for a "mini spy camera" and what appeared to be the camera that came in that box.

The images found on appellant's laptop were organized in the "pictures" section of the laptop, under the username "Daddy." Some of the images on the laptop were cropped to show only R.H.'s breasts and genitals; these

7

images had been copied from appellant's cell phone. One video was taken from the backyard of the house through the bathroom window.

Sergeant Fenner also discovered 1,030 images of R.H. on appellant's cell phone, including 33 nude images, 7 videos, and a video of her unclothed in the bathroom.

Images of other women, not R.H., were also discovered on the devices. These included pictures of young women in public that focused on their buttocks. There were also pornographic pictures of bound women and unconscious women being touched in sexual ways.

5. *Expert Testimony*

Dr. Jayme Jones, a clinical psychologist, testified as an expert on child sexual abuse accommodation syndrome (CSAAS), a theory explaining common behaviors of children who have been sexually abused. There are five components of CSAAS: secrecy; helplessness; accommodation; delayed disclosure; and recantation.

Dr. Jones explained that immediate disclosure of sexual abuse is uncommon. Only 10 to 15 percent of children disclose abuse in the first year, and by the fifth year only 20 to 30 percent of children have disclosed the abuse. Disclosure may also be delayed because the child still has a relationship with the abuser with good aspects to it; the child may still love the abuser, especially one who is a caregiver; and the child may be hoping the abuse will stop. Children may also be reluctant to disclose abuse in order to protect the abuser or the family from negative consequences. It is very common for a child who has suffered the same type of abuse multiple times to forget details.

B.    *Defense Case*

Appellant's son Myles had been friends with R.H. since elementary school and considered her his sister. R.H. spent weeks at Myles' house. Myles would see appellant and R.H. together. He saw R.H. on appellant's bed being a nuisance. Kayla also spent time in appellant's bedroom. They had "movie weekend" every weekend.

On November 30, 2018, Myles graduated from Marine Corps boot camp. R.H. went to Myles' going-away party. R.H. was friendly with appellant. Myles never saw R.H. upset or distressed.

Myles spoke to his father about the case and vowed to help him. He acknowledged receiving a statement from his father on how he should testify. He admitted his father told him to contact a witness and tell her not to cooperate with the prosecution.

C.    *Charges and Jury Verdicts*

In a second amended information filed on June 8, 2021, appellant was charged with a forcible rape (count 1; § 261, subd. (a)(2)); forcible sexual penetration of a minor victim over 14 years old (count 2; § 289, subd. (a)(1)(C)); forcible oral copulation of a minor victim over 14 years old (count 3; § 288a, subd. (c)(2)(C)); a lewd act upon a child under 14 years old (count 4; § 288, subd. (a)); disorderly conduct by secretly photographing a minor victim (count 6; § 647, subd. (j)(2)); and sexual battery by restraint (count 7; § 243.4, subd. (a)).[10] As to counts 1 through 4, it was alleged that appellant had suffered one prior serious or violent felony conviction, an assault with a

---

[10]    Counts 6 and 7 were renumbered as counts 5 and 6 for purposes of trial only, and the jury's verdicts reflect this renumbering. However, the abstract of judgment is consistent with the count designations in the information.

9

firearm (§ 245, subd. (a)(2)), within the meaning of section 667, subdivisions (a)(1) and (d), and section 1170.12, subdivision (b).

A jury found appellant guilty as charged. In a bifurcated proceeding, the court found that he suffered the prior convictions.

Appellant was sentenced to 62 years in state prison, which consisted of the upper term of 11 years on count 1, doubled to 22 years pursuant to the Three Strikes law; a consecutive upper term of 10 years on count 2, doubled to 20 years pursuant to the Three Strikes law; and a consecutive upper term of 10 years on count 3, doubled to 20 years pursuant to the Three Strikes law. The court struck the five-year enhancement (§ 667, subd. (a)), and imposed concurrent upper terms on counts 4 and 7 and a concurrent one-year jail term on count 6.

# DISCUSSION

## I.    *Marsden Motions*

Appellant contends that the trial court abused its discretion in denying his requests for new counsel, arguing that the record discloses an irreconcilable conflict between appellant and his court-appointed attorney. We disagree.

### A.    *Proceedings in Trial Court*

The trial court held four *Marsden* hearings or related proceedings prior to trial. Below, we summarize the relevant facts from these hearings.

### 1.    *January 16, 2020*

On January 16, 2020, after appellant stated he wanted to speak about the conduct of his attorney, the trial court conducted a *Marsden*[11] hearing. Appellant told the court that when he brought up his desire to challenge the search warrant executed at his home, his counsel responded by saying, "If you want to do all that, represent yourself."

Counsel explained that she simply told appellant that if he wanted to represent himself he could do so, but she also told him she would be getting additional discovery and would look into the search warrant issue. Appellant was insisting that the police are required to leave an itemized list of everything they have seized in every single room they have searched, as opposed to leaving one final list at the end of the search. Counsel pointed out that the police report indicated the police left a list, but appellant was insisting no list was left. Counsel needed to review a videotape of the search, as well as additional discovery related to the search warrant.

The court told appellant that motions to quash a search warrant or suppression motions did not typically occur that early in the proceedings and that counsel could not prepare a suppression motion until she had all the discovery.

Appellant then claimed that counsel was condescending and argumentative, and that she would threaten to walk away when he raised various questions about the case. Counsel denied making any such threats and stated that appellant had insisted that she set a search warrant motion to be heard that same day, but that she needed time to review the discovery. Counsel reiterated that she would look into the search warrant issue.

---

[11]    The January 2020 *Marsden* hearing was held a year and half before trial, which began on June 28, 2021.

11

The court denied the *Marsden* motion. The court found counsel had not made any threats. The court further found there was no breakdown in communication such that substitution of counsel was necessary. The court told appellant that he could represent himself or hire a private attorney if he did not want the public defender.

2.    *August 11, 2020*

On August 11, 2020, the trial court held another *Marsden* hearing at appellant's request. Appellant asserted his attorney had refused to file a suppression motion and had failed to preserve his right to appeal the issue.

Appellant argued the search warrant was invalid because under section 1535, the police must leave an itemized list "everywhere they take evidence from," and the police had failed to leave such a list at the time of the search.[12] Counsel responded that appellant was moving the goal posts. She stated his initial complaint was that the law required the police to leave a list of items taken in every room of the house. He then asserted the list of seized items was not left at his house in a timely manner. Counsel pointed out that the police report reflects that the police left a list on the inside of the porch, after they searched appellant's home and vehicle. Counsel had the list. Counsel stated she understood appellant's desire for a suppression motion, given the evidence seized from his home—including a hidden camera used to videotape a young girl—but that there was simply no legitimate basis for such a motion.

_____

[12]    Section 1535 provides that when an officer takes property under a warrant, a detailed receipt of the property taken must be provided to the person from whom it was taken or in whose possession it was found; or, in the absence of any person, the receipt must be left in the place where the property was found. (§ 1535.)

12

The court agreed that counsel did not have a good faith basis to attack the warrant upon the grounds asserted by appellant. The court pointed out that section 1535 simply states that an officer must leave a receipt, without any specific timing requirement. The court also expressed doubt that the failure to leave a list would require suppression of the evidence seized. The court found that counsel did not fail to preserve the legal rights of her client, as asserted by appellant, and denied the second *Marsden* motion.

### 3. *November 17, 2020*

On November 17, 2020, the court conducted a third *Marsden* hearing. Appellant protested that the preliminary hearing had been held despite his desire for a continuance to retain private counsel. He further complained that his attorney refused to challenge the search warrant.

The court pointed out that nearly one year had elapsed between appellant's arraignment and the preliminary hearing, which was more than enough time to hire a private attorney. Appellant then added that counsel never talked to him.

Counsel repeated that she did not file a motion to challenge the search warrant because it would have been meritless. Counsel stated that she had also gone over the discovery with appellant and discussed with him the strength of the case and possible defenses. Counsel observed that the problem, as she saw it, was that appellant "doesn't like what I have to say to him, which is discussing the state of the evidence" and noted that "today, [appellant] requested that [she] never speak to him again." Appellant claimed that counsel was lying and had not asked him one question all year about the case.

The court denied the *Marsden* motion. The court determined there was no irreconcilable conflict preventing adequate representation. The court found that counsel had made a tactical, legal-based decision that a suppression motion was inappropriate. The court further found counsel's representation—that she had discussed the case and facts with appellant—to be credible.

### 4.    *April 21, 2021*

On April 21, 2021, the court granted defense counsel's request to address the court without the presence of the district attorney. Counsel informed the court that appellant had just informed her that he had five witnesses who were very important to his case. She asked for a continuance of the trial to secure the witnesses' attendance.

The court resumed the proceedings with the prosecutor, stating that appellant had provided information to the court, but "not in a sense of a *Marsden* hearing." The court noted that appellant was seeking a continuance to allow potential witnesses to be interviewed who may provide exculpatory information. After hearing from the prosecution, the trial court granted a continuance and set the trial date for June 8, 2021, as requested by defense counsel. Appellant stated on the record that he agreed with the continued date.

Appellant's counsel asked to address the court again, without the presence of the district attorney, noting that she wanted to put on record a matter relevant to a *Marsden* hearing. The court accommodated counsel, and again cleared the courtroom.

Counsel told the court that although she and appellant had previously had regular communication, appellant had recently asked her to not visit him

14

in lock-up or to contact him by video conference. Despite it being appellant's choice to not meet with her about the case, that day appellant had asked her why she had not spoken with him. Counsel stated that she would "very much like to do the right thing by [appellant]," but she was continuously receiving conflicting information. Counsel stated appellant had confirmed that she could go to lock-up that day and meet with him, and she assured the court that she would follow up on the witnesses referenced that day and inquire as to whether appellant has any other witnesses in mind.[13]

B.    *Relevant Legal Principles*

An indigent defendant "may be entitled to an order substituting appointed counsel if he shows that, in its absence, his Sixth Amendment right to the assistance of counsel would be denied or substantially impaired." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1070, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

"'"When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first

---

[13]    Appellant asserts *Marsden* error in relation to the November 2020 hearing, but raises no issue with regard to the April 2021 proceedings. The record of the subsequent June 3, 2021 readiness hearing demonstrates that after the April 2021 hearing, the defense interviewed three of the five witnesses provided by appellant and deemed them irrelevant or unhelpful. This left appellant's son Myles, who had not returned defense counsel's phone calls and another potential witness whom counsel was unable to locate, despite several efforts. Counsel sought a trial continuance, but the court denied the request.

appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations].'"' (*People v. Hart* (1999) 20 Cal.4th 546, 603, quoting *People v. Crandell* (1988) 46 Cal.3d 833, 854; see also *Marsden, supra*, 2 Cal.3d at pp. 124–125.)

"Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.'" (*People v. Welch* (1999) 20 Cal.4th 701, 728–729.) "'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.'" (*Id.* at p. 729, quoting *People v. Carpenter* (1997) 15 Cal.4th 312, 376.) "Moreover, a defendant may not force the substitution of counsel by his own conduct that manufactures a conflict." (*People v. Smith* (1993) 6 Cal.4th 684, 696.)

A trial court's refusal to discharge appointed counsel is reviewed under the deferential abuse of discretion standard. (*People v. Jones* (2003) 29 Cal.4th 1229, 1245; *People v. Earp* (1999) 20 Cal.4th 826, 876.) "An abuse of discretion [only] occurs where the court's decision exceeds the bounds of law or reason." (*People v. Bell* (1998) 61 Cal.App.4th 282, 287.)

C.      *The Denial of Appellant's Marsden Motion Was Not an Abuse of Discretion*

Appellant claims that the "[t]here was no working relationship" between him and his counsel because she was not filing "certain motions." Appellant further argues that his counsel was "lying" when she claimed to have gone over the case with him, and that it was apparent by the time of the November 17, 2020 hearing that the "relationship had completely broken

16

apart." As we explain below, the trial court reasonably found appellant's stated grounds insufficient to warrant substitution of counsel.

First, appellant wanted to substitute counsel because he wanted her to file a motion to suppress evidence seized pursuant to a search warrant. However, at the first three hearings, the trial court inquired into the matter and ultimately agreed with counsel that appellant's proffered reasons for filing such a motion were not viable. Moreover, it is well established that mere tactical disagreements do not demonstrate an irreconcilable conflict (*People v. Welch*, *supra*, 20 Cal.4th at pp. 727–729; see also *People v. Orey* (2021) 63 Cal.App.5th 529, 568–569), and that a defendant represented by counsel "'surrenders all but a handful of "fundamental" personal rights to counsel's complete control of defense strategies and tactics.'" (*In re Barnett* (2003) 31 Cal.4th 466, 472.)

Second, in rejecting appellant's contention that counsel was "lying" when she stated she had discussed the case with appellant at the November 2020 hearing, the trial court expressly found counsel's representations on the point credible. Such credibility determinations are entitled to great deference given that the trial court is best positioned to make such demeanor-based assessments. (See *In re Parks* (2021) 67 Cal.App.5th 418, 447, fn. 9; *In re Wright* (1978) 78 Cal.App.3d 788, 801.)

Appellant nevertheless insists that "[e]ven if it was [appellant] who refused to speak to his attorney" or counsel was "ready and willing to speak with him," substitution was necessary once it was established "that there was no communication between the two." Not so. A defendant may not manufacture a conflict with counsel in order to force substitution of counsel. (See *People v. Smith*, *supra*, 6 Cal.4th at p. 697.) Were it otherwise, a defendant who disagrees with counsel's decision to forego a frivolous motion

could nevertheless force substitution by simply refusing to engage or cooperate with counsel. (See *People v. Crandell, supra,* 46 Cal.3d at p. 860 ["A trial court is not required to conclude that an *irreconcilable* conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness"].)

Further, at the November 2020 hearing, counsel represented that she had reviewed the discovery and discussed the strength of the evidence and possible defenses with appellant. She then informed the court that appellant had told her that same day that he did not want to further discuss the case with her. However, at the April 2021 hearing, counsel informed the court that appellant had sent her a witness list and then sought a continuance so that she could investigate and interview appellant's proposed witnesses. Counsel further stated that appellant had now expressed a desire to speak with her, and that she would meet with him that day. At the June 3, 2021 readiness hearing, counsel sought another continuance after informing the court that she had interviewed three of the witnesses, that one (appellant's son) had not returned her messages, and that she was unable to locate the other. After the trial was continued to June 24, 2021, both parties appeared that day and reported they were ready for trial. No further *Marsden* motions appear on record. These facts indicate that although appellant refused to communicate with counsel for a period of time, he resumed communication prior to trial and thereafter raised no further complaints.

In light of this record, we cannot conclude that counsel was providing inadequate representation or that appellant and counsel had become embroiled in such an irreconcilable conflict that ineffective representation was likely to result. (*People v. Hart, supra,* 20 Cal.4th at p. 603; *People v.*

*Crandell, supra,* 46 Cal.3d at p. 854; see also *People v. Marsden, supra,* 2 Cal.3d at pp. 124–125.) Appellant has failed to demonstrate the trial court abused its discretion in denying the *Marsden* motions.

II.    *Sufficiency of Evidence to Support Count 4*

Count 4 charged appellant with committing a lewd act under section 288, subdivision (a). One of the elements of this offense is that the victim must be less than 14 years old at the time of the offense.[14] Appellant contends that the jury's guilty verdict on this count is unsupported by substantial evidence because R.H.'s testimony regarding her age at the time of the offense was vague and she may have already turned 14. We disagree.

A.    *Relevant Legal Principles*

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) In so doing, we neither question the credibility of witnesses nor reweigh the evidence. (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

---

[14]    Section 288, subdivision (a) states, in part: "[A] person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years."

B.    *The Record Discloses Sufficient Evidence to Support the Jury's Determination that R.H. Was Under 14 Years of Age During the Offense Charged in Count 4*

R.H. was born on July 3, 2000. Count 4 was alleged to have occurred between July 3, 2012, and July 2, 2014, when R.H. was less than 14 years old.

At trial, R.H. testified to three separate incidents of sexual molestation. She stated that the final assault on the couch, charged in counts 1-3, occurred when she was in the 10th grade, and 15 years old. Count 7, the sexual battery by restraint, occurred sometime before counts 1-3. She did not specify a date for this offense, but stated that appellant began tying her up at the "end of middle school, beginning of freshman year." Based on her birth date, R.H. turned 14 years old on July 3, 2014, shortly before entering her freshman year in high school.

The basis for count 4 was the lewd act that occurred when R.H. fell asleep on appellant's bed and appellant repeatedly touched her vagina. R.H. initially testified that she did not remember when this happened. However, she subsequently agreed with the prosecutor's statement that this incident occurred "to the best of [her] knowledge, *approximately junior high.*" (Italics added.)

Moreover, in subsequent testimony, during which the prosecutor reviewed the charged incidents, R.H. confirmed that the incident on the couch (counts 1-3) took place during R.H.'s sophomore year when she was 15 years old, that the incident where she was tied to appellant's bed took place

during ninth grade, and that the lewd act underlying count 4 took place *"approximately during [her] eighth grade year."*[15] (Italics added.)

Appellant concedes that if the incident occurred when R.H. was in middle school or junior high then R.H. would have been 13 years old, and thus under 14 years old for purposes of count 4. Appellant, however, claims that because R.H. adopted the word "approximately" to confirm when the incident occurred, this means the incident occurred "*near* the time" R.H. was in junior high, but does not mean she was "*in* junior high." Appellant points out that R.H. turned 14 "the summer after junior high" (i.e., July 3, 2014) and argues that R.H. was therefore over 14 for a period of time when she was "close to junior high." Based on these observations, appellant argues that any finding that R.H. was under 14 years of age during the offense charged in count 4 would be pure speculation. We disagree.

Appellant's arguments are premised on his own interpretation of the record and are an invitation for us to reweigh the evidence. However, "it is the *jury*, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.) This means that "[i]f the circumstances reasonably justify the [trier of fact's] findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*Ibid*.) Indeed, only where "'upon no hypothesis whatever is there sufficient substantial evidence to support'" the judgment is reversal warranted. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Appellant cannot meet this standard.

---

[15]    Specifically, R.H. responded "yes" to the following query by the prosecutor: "Then from 2013 to '14, approximately during your eighth grade year, I think at this point we should maybe say 2012 because you said middle school—that's when you had this sleeping incident on the defendant's bed."

21

While it is true that "'"[a] finding of fact must be an inference drawn *from evidence* rather than . . . a mere speculation as to probabilities *without evidence*"'" (*People v. Raley* (1992) 2 Cal.4th 870, 891, italics added), such evidence was here presented. During her testimony, R.H. confirmed that the incident underlying count 4 occurred in "approximately junior high" and "*during*" her "eighth grade year." The jury could have reasonably inferred that this meant that the incident took place while R.H. was an active middle-school student, as opposed to *after* her graduation from middle school and during the summer before she entered high school.

III.   *Failure to Discharge Juror No. 1*

Appellant contends that the trial court violated his Sixth and Fourteenth Amendment rights because it failed to discharge a sleeping juror. Respondent counters that appellant forfeited this claim by failing to object to the juror's continued service and/or request a mistrial on grounds of juror misconduct. We agree with respondent.

A. *Proceedings in Trial Court*

On the afternoon of June 30, 2021, the second day of trial testimony, the prosecutor alerted the court that interns from her office, who had been observing the trial from the beginning, reported they had seen Juror No. 1 "continuously . . . dozing off." After being told this, the prosecutor herself began to watch the juror. During the testimony of prosecution expert Dr. Jones, the prosecutor "did notice Juror No. 1 doze off quite a few times. I saw his head nod down. I observed items actually fall off his lap, and it caused him to wake up. I also saw him wake up when he heard someone walk into the courtroom." She noted her cocounsel "also observed him yesterday

afternoon during [R.H.'s] testimony dozing off as well." Her interns informed her that he had also fallen asleep that day during the morning session. Defense counsel added that she also saw him asleep.

The court invited Juror No. 1 into the courtroom for questioning. The juror admitted he had fallen asleep "a little," but claimed he would be able to deliberate with other jurors because he had "taken down my notes." He claimed he only slept in the afternoon for five or 10 minutes. Juror No. 1 repeated he did not miss anything because "I've taken my notes." Defense counsel asked no questions.

The court found that even though Juror No. 1 had "dozed off a bit," he was alert, energetic, and willing to serve. The court asked defense counsel if it should take any further action. Defense counsel said no. The prosecutor also said no action should be taken. The court said it would keep an eye on Juror No. 1 to make sure he was alert and attentive. The court said that if Juror No. 1 continued to engage in that behavior, they would have to consider whether he should remain on the jury. Appellant points to no further discussions relating to Juror No. 1 after this point.

B.    *Appellant Has Forfeited His Juror-Related Claims By Failing to Object to Juror No. 1's Continued Service on the Jury*

Although section 1089[16] authorizes the substitution of a juror upon a showing of good cause, the failure of defense counsel to seek a juror's excusal

---

[16]    Section 1089 states, in part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box."

or otherwise object to the trial court's course of action forfeits the issue for review on appeal.  (See *People v. Holloway* (2004) 33 Cal.4th 96, 124 (*Holloway*).)

Here, defense counsel did not ask Juror No. 1 any questions regarding his alleged sleeping during witness testimony, nor did she ask the court to take any further action after the court ceased questioning Juror No. 1.  Instead, counsel acquiesced in the court's decision to retain Juror No. 1 and monitor his behavior for any further signs of inattention.  In so doing, counsel forfeited any claims arising out of the court's failure to discharge Juror No. 1.  (*Holloway*, *supra*, 33 Cal.4th at p. 124 ["Having expressed no desire to have the juror discharged at the time, and indeed no concern the juror had engaged in prejudicial misconduct, defendant 'is not privileged to make that argument now for the first time on appeal'"]; see also *People v. Williams* (2013) 58 Cal.4th 197, 289 (*Williams*) [claim forfeited where (after spectator reported seeing juror sleeping) defense counsel neither objected to juror's continued service nor requested a mistrial on ground of juror misconduct]; *People v. Lewis* (2009) 46 Cal.4th 1255, 1308 [juror misconduct claim forfeited where counsel agreed with court's intended inquiry and stated that he had no questions].)

Appellant concedes that counsel's failure to object to juror misconduct "[n]ormally" forfeits the issue for appeal, but urges us to nevertheless review the issue.  However, appellant cites no authority to support his contention that a juror who admittedly dozed off for a few minutes during trial automatically deprived a defendant of his constitutional right to a 12-member jury, thereby resulting in structural error.  To the contrary, our Supreme Court has invoked the forfeiture rule even where a spectator told the court that a juror had fallen asleep every day during trial.  (*Williams*, *supra*, 58

24

Cal.4th at pp. 287, 289.)  We see no reason to depart from application of the forfeiture rule here—especially given that defense counsel was present during the courtroom proceedings and acknowledged that she herself had, at one point, seen the juror doze off, but nevertheless declined to further pursue the matter.[17]

IV.    *Sixth Amendment Challenge to Consecutive Sentences Imposed Under Section 667.6(d)*

In counts 1 through 3, appellant was convicted of using force to commit rape, penetration with a foreign object, and oral copulation.  Generally, sentencing on multiple offenses is governed by section 1170.1, which allows either a concurrent sentence or a consecutive sentence with a principal term and consecutive subordinate terms of one-third the middle term.  (§ 1170.1.)  Under subdivision (d) of section 667.6 (hereafter 667.6(d)), however, *full-term, consecutive* sentences for certain enumerated sex offenses are mandatory "if the crimes involve separate victims or involve the same victim on separate occasions."  (§ 667.6, subd. (d)(1).)  The offenses alleged in counts 1 through 3 fall within the scope of section 667.6 (§ 667.6, subds. (e)(1), (e)(7) & (e)(8)), and the trial court at sentencing made the factual finding that the three offenses occurred on "separate occasions" within the meaning of section 667.6(d).  Accordingly, in addition to imposing the full principal term on count 1, the trial court imposed full-term sentences on counts 2 and 3.

---

[17]    To that point, we note that appellant does not argue that counsel was ineffective for failing to further act on the matter—presumably because he cannot establish, on this record, that counsel lacked any reasonable justification or tactical basis for her failure to do so.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003 [explaining ineffective of assistance of counsel claim must be rejected on appeal unless "'there simply could be no satisfactory explanation'" for counsel's action].)

25

Appellant contends the trial court's imposition of full-term, consecutive sentences on counts 2 and 3 based on the court's finding the offenses occurred on "separate occasions" violated his Sixth Amendment right to a jury trial. However, our Supreme Court very recently addressed an appellate split on this issue, and appellant's argument is now foreclosed. (See *People v. Catarino* (May 25, 2023) 2023 Cal. LEXIS 2804 (*Catarino*), disapproving *People v. Johnson* (2023) 88 Cal.App.5th 487.)

In *Apprendi v. New Jersey, supra,* 530 U.S. 466 (*Apprendi*), the United States Supreme Court held that the Sixth Amendment requires that a jury find any fact (other than a prior conviction) that increases the statutory maximum penalty for a crime. (*Id.* at p. 476.) In *Alleyne v. United States* (2013) 570 U.S. 99 (*Alleyne*), the Supreme Court extended *Apprendi* by holding that its rule also applied to factual findings that increase the mandatory minimum sentence for a crime. (*Id.* at p. 103.) In *Oregon v. Ice* (2009) 555 U.S. 160 (*Ice*), however, the Court held the *Apprendi* rule does not apply to facts deemed necessary to the imposition of consecutive as opposed to concurrent sentences, "a sentencing function in which the jury traditionally played no part." (*Id.* at p. 163.)

In *Catarino*, our Supreme Court has now held that "the rule of *Apprendi* and *Alleyne* does not apply to section 667.6(d) under the rationale of *Ice*," and thus section 667.6(d)'s requirement that the trial court impose "full, separate, and consecutive term[s]" for certain sex crimes when the court finds they were committed on "separate occasions" complies with the Sixth Amendment. (*Catarino, supra,* 2023 Cal. LEXIS 2804 **2, 17 [disapproving *Johnson, supra*, 88 Cal.App.5th 487].) In light of our Supreme Court's decision in *Catarino*, we reject appellant's Sixth Amendment *Apprendi*-based challenge to the trial court's application of section 667.6(d) to impose

26

consecutive, full-term sentences for counts 2 and 3. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

V.    *Sufficiency of Evidence to Support Consecutive Sentences Under Section 667.6(d)*

As previously indicated, in counts 1 through 3, appellant was convicted of using force to commit rape, penetration with a foreign object, and oral copulation. Each offense took place on the couch in the living room on the same morning. The People argued that although the offenses were committed in the same location and on the same morning, they qualified as separate occasions within the meaning of section 667.6.(d) because appellant had "a reasonable opportunity to reflect upon his actions" between each assault. The trial court agreed, finding that count 2 was "a completely separate occasion," and count 3 was "a completely separate and distinct crime, separated [*sic*] occasion; so consecutive sentencing is appropriate." Appellant contends that this finding was unsupported by substantial evidence, thereby requiring reversal. We disagree.

A.    *Relevant Legal Principles*

Under section 667.6(d), full-term consecutive sentences are mandatory "if the crimes involve separate victims or involve the same victim on separate occasions." (§ 667.6, subd. (d)(1).) In determining whether sex crimes against a single victim were committed on separate occasions, "the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or

27

abandoned the opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." (§ 667.6, subd. (d)(2); see *People v. Jones* (2001) 25 Cal.4th 98, 105 (*Jones*) ["the appropriate analysis for determining whether sex offenses occurred on 'separate occasions' [is] whether the defendant had a reasonable opportunity for reflection"].) "Once a trial judge has found under section 667.6, subdivision (d), that a defendant committed offenses on separate occasions, we may reverse only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092; see also *People v. Plaza* (1995) 41 Cal.App.4th 377, 385 ["where, as here, the trial court finds the time and the circumstances were sufficient to afford the defendant with the required opportunity to reflect upon his actions and he thereafter resumed his *sexually* abusive conduct, that finding will be upheld unless no reasonable trier of fact could have so concluded"].)

B.      *Sufficient Evidence Supports the Trial Court's Finding that Mandatory Consecutive Sentences Were Required Under Section 667.6(d)*

Appellant concedes that the charges identified in counts 1 through 3 fall within the scope of section 667.6 and further acknowledges that "[t]here is no bright line rule" on the question of what constitutes "separate occasions." Nevertheless, appellant insists that the trial court's determination in this case was unsupported by substantial evidence. We disagree.

Prior to the first sexual offense (charged as count 2, forcible sexual penetration), appellant asked R.H. to sit next to him on the living room

couch. Appellant started rubbing R.H.'s vagina over her clothes; she told him to stop, but appellant ignored her and continued the act. Appellant then put his hands under her clothes and his fingers inside her vagina. R.H. told appellant she had to get ready for school, and he responded that they had time. R.H. then pushed appellant away, but appellant put his arm around her waist and pulled her closer. Appellant took off his pants. R.H. told appellant that Kayla and Myles were going to wake up and she had to get ready for school; appellant responded that they had time because Myles and Kayla were still sleeping.

Appellant then committed the second sexual offense (charged as count 3—forcible oral copulation of a minor). He put his mouth on R.H.'s vagina. R.H. again told him to stop, and that this was not okay, but he ignored her and kept going.

Appellant then committed the third sexual offense (charged as count 1—rape of a minor) by raping R.H. when he inserted his penis inside her vagina. R.H. told him to stop, but appellant said "it's okay" and kept going. At some point during this final assault, R.H. could hear that Myles and Kayla were awake and she was able to successfully push appellant away and go to the bathroom.

Appellant had an opportunity to reflect and stop his sexual assault on R.H. between each act, but did not do so. Instead he changed positions, and proceeded to the next act, undressing between acts one and two, and changing positions between acts two and three and ignoring R.H.'s pleas to stop. (See *People v. Irvin* (1996) 43 Cal.App.4th 1063, 1071 [observing that "a trial court could find a defendant had a 'reasonable opportunity to reflect upon his or her actions' even though the parties never changed physical locations and the parties 'merely' changed positions"]; *People v. King* (2010)

183 Cal.App.4th 1281, 1325 [appellant's momentary distraction by lights of passing car was sufficient to find that he had the opportunity to reflect prior to next sexual assault]; *People v. Plaza, supra,* 41 Cal.App.4th at p. 384 [affirming the trial court's finding that sexual assaults occurred on "separate occasions" although all of the acts took place in the victim's apartment, with no break in the defendant's control over the victim]; see also *Jones, supra,* 25 Cal.4th at p. 104 [noting that courts "have not required a break of any specific duration or any change in physical location" for mandatory provisions of § 667.6]; but see *People v. Pena* (1992) 7 Cal.App.4th 1294, 1316 [defendant's change of positions between different sexual acts was insufficient by itself to provide him with a reasonable opportunity to reflect upon his actions, "especially where the change is accomplished within a matter of seconds"].)

Appellant nevertheless insists that "[t]he acts occurred in a continuous, unbroken sequence" and "there is *no* evidence from which to draw the inference that defendant had the opportunity to reflect on his behavior during this brief sequences of events." (Italics added.) Appellant's contention is contradicted by the record which, as discussed above, not only shows that appellant changed positions between each act, but reflects that R.H. pleaded for him to stop his actions (and expressed concerns that the others would hear), while appellant responded with reassurances and/or simply proceeded to move into the next violative act.

Appellant also cites to *People v. Reeder* (1984) 152 Cal.App.3d 900, 915–916 for the proposition that "a sequence of sexual acts is considered a single occasion where each took place . . . during a short span of time." However, the legislative definition of "separate occasions" was added in 1986 and abrogated cases, such as *Reeder*, which had relied on the duration of time or

change in physical location between crimes as the determinative factors in favor of a "'broader, less stringent standard.'" (*Jones, supra*, 25 Cal.4th at p. 104 & fn. 2.)

Under the facts of this case, as set forth above, a trier of fact could have reasonably found that appellant was guilty of at least three separate and distinct sexual offenses against R.H.[18] (*People v. Plaza, supra*, 41 Cal.App.4th at p. 385; cf. *People v. Jones, supra*, 25 Cal.4th at pp. 104–105.) Accordingly, the trial court properly imposed consecutive sentences on counts 1 through 3.

VI.    *Senate Bill No. 567*

Appellant contends that the recent enactment of SB 567, which amended section 1170, subdivision (b), and now limits the court's discretion to impose the upper term, requires a remand for resentencing on counts 1-3. Although we agree that the recent amendments apply retroactively to appellant, we conclude that remand is unnecessary in this case. The trial court based the upper term on appellant's recidivism, which was supported by a certified record of appellant's prior convictions as permitted under section 1170, while we deem harmless any error in the court's reliance on additional offense-related factors.

---

[18]    To that point, appellant argues that "[a] reasonable view of the evidence shows the offenses occurred on the *same* occasion." However, in determining whether substantial evidence supports a particular finding, a contrary view of the evidence that might also be "reasonable" does not warrant reversal; only if *no* rational trier of fact could have made the finding at issue is reversal required. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) Appellant cannot meet that standard here.

A. *Proceedings in the Trial Court*

In its sentencing memorandum, the prosecution requested that the trial court impose the maximum prison sentence for all counts, and identified a number of factors in aggravation for all offenses. The prosecution asserted there were no factors in mitigation for appellant.

During the August 26, 2021 sentencing hearing, the trial court imposed an aggregate sentence of 62 years, which included upper terms on count 1 (11 years), count 2 (10 years) and count 3 (10 years). The court identified the aggravating circumstances as follows:[19] "That the victim, [R.H.], was particularly vulnerable; the manner in which the crimes were carried out indicate planning, sophistication, and professionalism. And, most certainly, the defendant took advantage of a position of trust and confidence in order to commit these offenses.

"With respect to factors in aggravation relating to defendant, he has engaged in violent conduct that indicates a serious danger to society. His prior convictions as an adult are numerous and of increasing seriousness. He had served prior prison terms. I can find no factors in mitigation relating to Mr. Alvarez, nor can I find factors in mitigation relating to the crime itself, *so certainly high term is warranted.*" (Italics added.)

---

[19] The court used the same circumstances to justify imposing the upper term on each of the three counts which, as appellant concedes, is permitted. (*People v. Price* (1984) 151 Cal.App.3d 803, 812 [noting that sentencing court may use the same fact to impose more than one aggravated term provided the fact "is reasonably related to the particular count"].)

B.     *Relevant Law*

1.     *Law Prior to the Enactment of SB 567*

a.     *Cunningham v. California*

In *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*), the United States Supreme Court explained that "the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (*Id.* at pp. 274–275.) The court then held that California's procedure for selecting upper term sentences under former section 1170, subdivision (b), violated the defendant's Sixth and Fourteenth Amendment right to a jury trial because it gave "to the trial judge, not to the jury, authority to find the facts that expose a defendant to an elevated 'upper term' sentence." (*Cunningham*, at p. 274.)

At that time, California's determinate sentencing law (DSL), which specifies three terms of imprisonment by statute for most offenses, provided that "'the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime.'" (*People v. Sandoval* (2007) 41 Cal.4th 825, 836 (*Sandoval*), quoting former § 1170, subd. (b).) The DSL further required that facts relevant to this sentencing choice be determined by the court and proved by a preponderance of the evidence, and that the court set forth its reasons for departing from the middle term. (*Sandoval,* at p. 836.)

In deeming such a procedure violative of Sixth Amendment principles, the *Cunningham* court explained that although a trial judge can ordinarily exercise his or her discretion to select a sentence within a statutorily-defined range without running afoul of the Sixth Amendment, the "maximum term" under California's DSL was, in fact, the middle term. The Court so concluded

33

because the middle term, as defined under California law, was the maximum term that could be imposed on the jury's verdict alone, while any departure from that term required additional, and specified, fact-finding. (*Cunningham*, *supra*, 549 U.S. at pp. 278, 288–289; *Sandoval*, *supra*, 41 Cal.4th at pp. 836–837.)

        b.     *Black* and *Sandoval*

In *People v. Black* (2007) 41 Cal.4th 799, our Supreme Court held that "imposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions." (*Id.* at p. 816.) "By the same reason," in *Sandoval*, *supra*, the Court held that "if a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless." (42 Cal.4th at p. 839.)

The *Black/Sandoval* conclusion that only one aggravating factor must be established in accordance with Sixth Amendment principles was tied to the fact that "[u]nder California's determinate sentencing system, the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term." (*Black*, *supra*, 41 Cal.4th at p. 813; cf. *id.* at p. 815, citing *People v. Osband* (1996) 13 Cal.4th 622, 728.)

> c. *Legislative Amendments to Section 1170 in Response to Cunningham*

In response to *Cunningham*, in 2007 the Legislature passed a bill that amended section 1170, subdivision (b) by eliminating the requirements of judicial fact-finding to impose a lower or upper term and granting judges the discretion to select any term within the statutory range. (Stats. 2007, ch. 3, § 2 (Sen. Bill No. 40).)

> 2. *Enactment of SB 567*

SB 567, which took effect on January 1, 2022, amended section 1170 "to specify that, when a sentencing court chooses a term from a statutory triad, the chosen term shall not exceed the middle term, unless the facts supporting the aggravating circumstances are (1) established by the defendant's stipulation to them, (2) proven to a jury (or to a court, if jury is waived) beyond a reasonable doubt, or (3) based on prior convictions evidenced by a certified record of conviction." (*People v. Jones* (2022) 79 Cal.App.5th 37, 44; Stats. 2021, ch. 731, §§ 1.3, 3(c), adding § 1170, subd. (b)(1)-(3), by amendment.)

The parties agree, as do we, that the amendments to section 1170 wrought by SB 567 retroactively apply to the upper-term sentence imposed on appellant for count 1. (See *People v. Garcia* (2022) 76 Cal.App.5th 887, 902.) However, the parties disagree as to whether remand for resentencing is necessary.

> 3. *Harmless Error Tests Post-SB 567*

Published California appellate decisions to consider the retroactive application of the current version of section 1170, subdivision (b), appear to

uniformly recognize that the failure to submit an aggravating circumstance for determination by a jury does not require reversal where the error is harmless. However, they differ on the correct test to apply in making such a determination.

### a. *Flores Test*

In *People v. Flores* (2022) 75 Cal.App.5th 495, the court of appeal concluded that "'if a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury,' the error is harmless." (*Flores*, at p. 500; see also *People v. Salazar* (2022) 80 Cal.App.5th 453, 465 [concluding, in a split decision, that "*Flores* is the standard governing appellate review"], review granted Oct. 12, 2022, S275788].)

### b. *Lopez Test*

In *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*), the court of appeal concluded that the standard articulated in *Flores* was incomplete and instead, to find harmless error, a reviewing court must conclude beyond a reasonable doubt that a jury would have unquestionably found true beyond a reasonable doubt *every* aggravating factor upon which the trial court relied at the time of sentencing. (*Id*. at p. 466.) If the reviewing court can do so, the error is harmless; if not, the court considers whether it is reasonably probable that the trial court would nevertheless have exercised its discretion to select the upper term "based on a single permissible aggravating factor or on some constellation of permissible aggravating factors," rather than all of the factors on which it previously relied. (*Lopez*, at p. 468; see *id*. at pp. 463, 467; accord,

*People v. Wandrey* (2022) 80 Cal.App.5th 962, 982 & fn. 34, review granted Sept. 28, 2022, S275942.)

Recently, the court that decided *Flores* abandoned its approach in favor of the *Lopez* standard. (*People v. Ross* (2022) 86 Cal.App.5th 1346, 1355, fn. 8 (*Ross*), review granted Mar. 15, 2023, S278266.) In so doing, the court noted it had based its *Flores* test entirely on *Sandoval, supra,* 41 Cal.4th 825, which had addressed *Cunningham* error under the *previous* version of section 1170. (*Ross, supra,* 86 Cal.App.5th at pp. 1354, 1355.) Under the amended version of section 1170, however, all facts underlying the circumstances used to justify imposition of the upper term must be found true by a jury. (*Ross,* at pp. 1353–1358 & fn. 8; § 1170, subd. (b).) As such, reliance on *Sandoval* was no longer appropriate. (*Ross,* at p. 1355, fn. 8.) The court also found "the rationale for adding a state law harmless error component both logical and compelling," because defendants are "entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court." (*Id.* at p. 1354, internal quotation marks omitted.)

      c.    *Dunn Test*

In *People v. Dunn* (2022) 81 Cal.App.5th 394 (*Dunn*), review granted Oct. 12, 2022, S275655), the court of appeal added a slight variation on the *Lopez* standard by holding that in order to find error harmless in this context, a reviewing court must (1) conclude beyond a reasonable doubt that a jury would have unquestionably found true at least one aggravating factor beyond a reasonable doubt; (2) determine whether it is reasonably probable that a jury would have found true any remaining aggravating factors relied upon by the trial court to impose an upper term sentence; and (3) conclude that it is reasonably probable the trial court would not have exercised its discretion

differently had it considered only the aggravating factors provable from the record as determined in the prior steps. (*Dunn*, at pp. 409–410; see also *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1112–1113 [applying similar variation as *Dunn*].)

The *Dunn* court concluded that it was not necessary to apply the stricter constitutional standard for harmless error to all aggravating factors at the first step because SB 567 itself created only a state-law right to a jury trial. (*Dunn*, *supra*, 81 Cal.App.5th at p. 408.) As such, any *Cunningham*/Sixth Amendment error could be cured by *Sandoval*'s stricter standard as applied to a single aggravating factor, while any SB 567-related error could be cured by the more lenient state law harmless error standard as applied to the remaining aggravating factors. (*Dunn*, at p. 409.)

C.    *Analysis*

Here, appellant contends that "*Lopez* states the law correctly," while respondent argues that the *Dunn / Zabelle* approach "presents the more well-reasoned analytical framework." We need not take a side in the dispute because we conclude that the error here is harmless even under the stricter approach in *Lopez*.

First, under newly added subdivision (b)(3) of section 1170, the sentencing court may rely upon certified records of a defendant's prior convictions in selecting the sentence without submitting the prior conviction to the jury. (Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(3).) Here, certified records of appellant's prior convictions were admitted in the trial court. In imposing an upper term sentence for counts 1 through 3, the trial court properly relied upon appellant's criminal history, finding that he had suffered prior convictions which were numerous and of increasing seriousness

38

and that he had served prior prison terms.  (See *Black*, *supra*, 41 Cal.4th at pp. 818–820 [stating that exception for prior convictions must not be read "too narrowly" and encompasses "other related issues that may be determined by examining the records of the prior convictions," including whether defendant's prior convictions were numerous or of increasing seriousness]; *People v. Towne* (2008) 44 Cal.4th 63, 79–84 [trial court's findings that a defendant served prior prison terms and was on probation or parole at time of the offense fall within prior conviction exception].)  As such, there was no section 1170 error with regard to the aggravating factors tied to appellant's prior conviction record.  (See *Dunn*, *supra,* 81 Cal.App.5th at p. 410; *Lopez, supra*, 78 Cal.App.5th at pp. 455–456, 465–466.)

Appellant concedes that the trial court's reliance on his criminal history was permissible under newly amended section 1170 but argues that none of the three circumstances relating to the commission of the offenses—victim vulnerability, position of trust, or planning and sophistication—can be deemed harmless.  In so arguing, appellant points out that our Supreme Court in *Sandoval* noted that "to the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Sandoval, supra*, 41 Cal.4th at p. 840.)  Although *Sandoval* did set forth this note of caution, it did not, like appellant does here, simply end the inquiry and/or suggest that a reviewing court can *never* conclude that a jury would have found such aggravating factors true beyond a reasonable doubt.  To the contrary, our Supreme Court—as well as intermediate appellate courts— have found Sixth Amendment error in relation to such offense-related factors

39

to be harmless.  (See e.g.*, People v. Wilson* (2008) 44 Cal.4th 758, 812–813 [*Cunningham* error harmless because jury would have found beyond a reasonable doubt that the victim was vulnerable or that appellant isolated the victim]; *People v. DeHoyos* (2013) 57 Cal.4th 79, 154 ["Unquestionably, under these circumstances, a jury would find planning and sophistication by defendant in committing the crimes"]; *People v. Tompkins* (2010) 185 Cal.App.4th 1253, 1267 ["parenthood is the quintessential position of trust and confidence, and no reasonable jury would have rejected such a finding in this case"]; *People v. Curry* (2007) 158 Cal.App.4th 766, 794 [concluding the record contained "overwhelming evidence that [defendant's] actions were cruel and callous toward two vulnerable victims"].)

Here, too, we can conclude, beyond a reasonable doubt, that a jury would have found true at least two of the offense-related aggravating factors cited by the trial court—i.e., that the victim R.H. was "particularly vulnerable" and that appellant took advantage of a position of trust.  (Cal. Rules of Court, rule 4.421(a)(3) & (11).)

In the prosecution's sentencing memorandum, which the trial court considered, the prosecution stated that R.H.'s status as a foster child from an unstable home made her particularly vulnerable, and that appellant took advantage of his position of trust as the only father figure in her life.  "As used in the context of rule 4.421(a)(3), a 'particularly vulnerable' victim is one who is vulnerable 'in a special or unusual degree, to an extent greater than in other cases.  Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, *one who is susceptible to the defendant's criminal act. . . .*' [Citation.]"  (*People v. Bloom* (1983) 142 Cal.App.3d 310, 321, italics added.)

40

Although our Supreme Court determined in *Sandoval* that in that case it could not conclude the jury would have found the victims were particularly vulnerable, it did so because the trial evidence supporting the trial court's finding—that the victims were unarmed or taken by surprise—was contested and underwhelming. (*Sandoval, supra*, 41 Cal.4th at p. 842.) In so concluding, the Court observed the record "does not reflect such a clear-cut instance of victim vulnerability that we confidently can conclude the jury would have made the same findings, as might be the case if, for example, the victims had been elderly, very young, or disabled, *or otherwise obviously and indisputably vulnerable*." (*Id.* at p. 842, italics added.) Here, such a record exists.

Victim R.H. was placed in foster care shortly after her birth, but she was never adopted and was searching for some sense of home. Once she befriended Kayla, R.H. regularly spent five to six nights a week at appellant's home, came to trust appellant, and "loved" him "as a father." R.H. testified that appellant "provided for me a home that was I thought safe, uh, food, he was welcoming more than my foster family," and he drove her to and from school and other friends' homes—"stuff that [her foster] mom wouldn't provide." In explaining why she did not report the assaults, R.H. testified she was afraid she'd be put in another foster home. Given that R.H.'s status as a foster child was undisputed, and her familial relationship with appellant was corroborated by both Kayla and appellant's son Myles (who testified in support of appellant), we have no difficulty concluding that a jury would have found that R.H.'s relationship with appellant made her "obviously and

41

indisputably vulnerable" to appellant's inappropriate conduct.[20] (*Sandoval, supra*, 41 Cal.4th at p. 842; cf. *People v. Wilson, supra*, 44 Cal.4th at pp. 812–813 [victim's vulnerability was easily established where she testified that defendant took her to isolated location by car].)

In light of the overwhelming evidence of appellant's status as the only father figure in R.H.'s life, we also find the trial court's reliance on the circumstance that appellant took advantage of a position of trust or confidence harmless beyond a reasonable doubt.[21] (Cf. *People v. Tompkins, supra*, 185 Cal.App.4th at pp. 1266–1267 [observing that "parenthood is the quintessential position of trust"]; *People v. Baughman* (2008) 166 Cal.App.4th 1316, 1323 [jury would "unquestionably" have found that father took advantage of a position of trust and confidence to commit oral copulation with 14-year-old daughter].)[22]

---

[20] Indeed, R.H. further testified that in March 2017, years after the rape, she returned to see appellant because there was a "part" of her that missed him, and that she missed having a "father figure" in her life.

[21] We also point out that an aggravating fact is a fact that makes the offense "'distinctively worse than the ordinary.'" (*Black, supra*, 41 Cal.4th at p. 817; see also Cal. Rules of Court, rule 4.420(h) [courts may not use "[a] fact that is an element of the crime" to impose a particular term].) Here, counts 1-3 required that R.H. was a minor who was over 14 years of age at the time of the crimes. However, no prior relationship or interaction between victim and perpetrator is necessary for these offenses.

[22] Indeed, consistent with the testimony that R.H. and Kayla were "like sisters," R.H. testified that she continued to frequent appellant's home after the sexual abuse—and before Kayla moved out—because she feared that if she were not there, appellant would do these things to Kayla.
We further note that the jury found appellant guilty of sexual battery based on an incident in which appellant sexually assaulted R.H. while she was bound in restraints. However, the first time appellant put R.H. in restraints was when she was with Kayla in the living room; appellant told

The third factor cited by the trial court—that the manner in which the crimes were carried out indicates planning, sophistication, and professionalism (Cal. Rules of Court, rule 4.421(a)(8))—is not so clear cut. That is, while the jury could have found that appellant's grooming behavior, including the increasing severity of his sexual assaults, demonstrated "planning," it is not so clear that they would "unquestionably" find his conduct to be sophisticated or demonstrative of professionalism. However, we need not belabor the point because we conclude that even if this factor is excluded from step two of the *Lopez* analysis, there is no reasonable probability the trial court would have imposed a lower sentence.

In arguing otherwise, appellant relies on *Zabelle*, *supra*, 80 Cal.App.5th at page 1115. *Zabelle* is distinguishable. In *Zabelle*, the trial court found two factors in mitigation, and eight in aggravation, prior to imposing an upper term sentence. (*Id.* at pp. 1113–1114.) The appellate court found that the jury would have found at least four of the factors true beyond a reasonable doubt, but could not conclude the trial court would have found these circumstances sufficient to warrant imposition of the upper term. (*Id.* at pp. 1114–1115.) In so concluding, the court noted that the trial court (1) "gave no particular weight to any of its listed aggravating circumstances" and (2) did not indicate "whether its decision to impose the upper term was (or was not) a close call." (*Id.* at p. 1115.)

Here, by contrast, we have concluded that all but one of the aggravating factors meet the first step of the *Lopez* test, and the court found

R.H. he did this to train her how to escape if she ever found herself in that situation. This is a poignant example of how appellant connived to establish his position of trust—both as father figure and protector—prior to the sexual acts that took place, including those in counts 1 through 3.

43

no mitigating factors. Moreover, during its pronouncement of sentence, the court stated "*most certainly*, the defendant took advantage of a position of trust and confidence in order to commit these offenses" and concluded its decision to impose upper terms by stating "*so certainly* high term is warranted."[23] (Italics added.) The court's statements indicate that this was not a close call, and that it considered the position of trust factor especially strong. (Cf. *Zabelle*, 80 Cal.App.5th at p. 1115.) Finally, after the court selected the upper terms on counts 1 through 3, doubled the terms pursuant to the prior strike, and found consecutive sentences mandated by the "separate occasion" provision of section 667.6, the court stated that it would impose concurrent sentences on the remaining counts because "the court feels that the enhanced terms mandated by law as to counts 1, 2 and 3 plus the doubling of those full-term sentences is sufficient for purposes of punishment for the offenses for which [appellant] now stands convicted." This further indicates that the trial court had reached an aggregate term it found appropriate and sufficient, and was therefore choosing to run the terms on the remaining counts concurrent. On this record, we do not find it reasonably probable that the trial court would have imposed a more favorable sentence

---

[23] We note that although the trial court did not further elaborate on the position-of-trust factor while imposing the aggravated terms for counts 1 through 3, it discussed the offense conduct moments earlier when denying appellant's request to strike the prior strike. In so doing, the court described appellant's conduct as follows: "In this case there is no question that the victim, [R.H.], was dealt a poor hand in life beginning at birth. *She was ultimately invited into the defendant's home under this false banner of finally receiving a loving family and a safe home* but instead and over the course of several years she was, essentially, groomed and exploited by the defendant as nothing more than an instrument that he routinely used to satisfy his own sexual impulses in a deviant way; but, nonetheless, he certainly victimized [R.H.] multiple times over the course of years." (Italics added.)

had it excluded from its consideration the planning-and-sophistication factor. (Cf. *Zabelle*, at p. 1115; cf. *Lopez, supra*, 78 Cal.App.5th at pp. 467–468.)

Accordingly we find any error under SB 567 harmless and remand, therefore, unnecessary.

VII. *Imposition of Fines and Fees*

In addition to the 62-year prison term, the trial court ordered appellant to pay a variety of fines and fees, including a $180 court facilities assessment, a $240 court operations assessment, a $300 restitution fine, and $9,430 in sex offender fines and penalties. Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), appellant contends the trial court erred by failing to hold an ability to pay hearing before imposing these fines and fees. Respondent asserts that appellant forfeited the issue by failing to object at sentencing, which occurred more than two and one-half years after the *Dueñas* decision. We agree.

In *Dueñas*, Division Seven of this court held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes" certain fines and fees. (*Dueñas, supra*, 30 Cal.App.5th at p. 1164.) Division Seven subsequently held that "[c]onsistent with *Dueñas*, a defendant must in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490; *People v. Kopp* (2019) 38 Cal.App.5th 47, 96 (*Kopp*) ["It is the defendant who bears the burden of proving an inability to pay"], review granted Nov. 13, 2019, S257844.) Appellant's failure to object on the basis of *Dueñas* forfeited his challenge. (Cf. *People v. Avila* (2009) 46 Cal.4th 680, 729 [failure

to assert that court must consider inability to pay when imposing more than the statutory minimum restitution fine forfeited challenge].)

To the extent appellant alleges trial counsel was ineffective for failing to challenge his ability to pay, the record is insufficiently developed to address the issue on direct appeal. (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1003 [explaining ineffective of assistance of counsel claim must be rejected on appeal unless "'there simply could be no satisfactory explanation'" for counsel's action].)

Appellant points out he was appointed counsel and thus could not afford private counsel for his defense. However, the fact that a defendant is represented by publicly funded counsel at trial and sentencing does not automatically establish his inability to pay fines or assessments. (See e.g., *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397 [noting defendant may lack the ability to pay the costs of court-appointed counsel yet have the ability to pay a restitution fine]; see also *People v. Vournazos* (1988) 198 Cal.App.3d 948, 958 [record supported finding of defendant's ability to pay $2,180 in restitution despite being indigent enough to qualify for court-appointed counsel and inability to post bail].)[24]

---

[24] Appellant also challenges the court's direct victim restitution order of $420, imposed under section 1202.4, subdivision (f). However, that provision precludes a court from considering a defendant's inability to pay in determining the amount of restitution, and appellant cites no case extending the reasoning in *Dueñas* to victim restitution payments. (Cf. *People v. Evans* (2019) 39 Cal.App.5th 771, 777 ["Based on the significant differences in purpose and effect between victim restitution and the moneys at issue in *Dueñas*, we decline to extend the rule of *Dueñas* to victim restitution"].)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STONE, J.[*]

We concur:


CURREY, Acting P. J.


COLLINS, J.

[*]Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.